# IN THE UNITED STATES COURT OF APPEALS
# FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**FILED**

October 17, 2019

Lyle W. Cayce
Clerk

No. 18-20809

In the Matter of: STEPHANIE MARIE HENRY

        Debtor

STEPHANIE MARIE HENRY, formerly known as Stephanie Marie
Henschel,

        Appellee

v.

EDUCATIONAL FINANCIAL SERVICE, A Division of Wells Fargo Bank,
N.A.,

        Appellant

───────────────

Appeal from the United States Bankruptcy Court
for the Southern District of Texas

───────────────

Before KING, HIGGINSON, and DUNCAN, Circuit Judges.

PER CURIAM:

Years after Stephanie Marie Henry took out a student loan, she filed for
bankruptcy and received a discharge. Henry and the company that currently
holds her loan, Educational Financial Service, a Division of Wells Fargo Bank,

N.A., disagree about whether Henry's discharge applies to that loan.[1] Henry filed an adversary proceeding in bankruptcy court raising that issue, but Wells Fargo moved the bankruptcy court to compel arbitration. The bankruptcy court denied that motion, and for the following reasons, we AFFIRM.

## I.

Stephanie Marie Henry borrowed money from Wachovia Bank of Delaware, N.A.—the predecessor in interest of Educational Financial Service, a Division of Wells Fargo Bank, N.A. ("Wells Fargo")—to attend the Ultrasound Diagnostic School in Houston. The documentation for the loan contained the following arbitration provision:

> 14. Arbitration. Any controversy or claim arising out of or related to this Note, or an alleged breach of this Note, shall be settled by arbitration in accordance with the Commercial Arbitration Rules of the American Arbitration Association. Judgment upon the arbitration award may be entered in any court having jurisdiction.

Henry signed that documentation on November 11, 2002.

More than a decade later, Henry filed for bankruptcy under Chapter 13 of the Bankruptcy Code in the United States Bankruptcy Court for the Southern District of Texas. Wells Fargo filed a proof of claim in Henry's bankruptcy proceeding. The bankruptcy court confirmed Henry's Chapter 13 plan on April 25, 2013. Over the next five years, Henry made payments to her creditors, including Wells Fargo, as required by her plan. Because Henry completed her Chapter 13 plan, the bankruptcy court entered a discharge order on May 17, 2018.

When Henry received her discharge, her attorney sent a letter to Wells Fargo. That letter stated that Henry's debt to Wells Fargo had been discharged

---

[1] The Bankruptcy Code says that some—but not all—student loans are not dischargeable unless failing to discharge the loan "would impose an undue hardship on the debtor and the debtor's dependents." 11 U.S.C. § 523(a)(8).

and asked Wells Fargo: "Please acknowledge that you recognize the discharge of this loan, and report it accurately on [Henry's] credit reports." Wells Fargo sent a reply letter to Henry's lawyer, stating that Wells Fargo had processed his "request to cease all communication with Stephanie Henry" about her loan. Wells Fargo indicated that future correspondence would be sent to the lawyer—not Henry—and asked the lawyer: "Once Stephanie Henry is no longer your client, please contact our office . . . to let us know communication should resume with Stephanie Henry." Wells Fargo sent a different letter to Henry, telling her that it had "received a request from Austin C. Smith ESQ to cease all communication on" Henry's loan. Both of Wells Fargo's letters contained the following postscript: "The laws of some states require us to inform you that this communication is an attempt to collect a debt and . . . information obtained will be used for that purpose."

Wells Fargo's correspondence prompted Henry to initiate an adversary proceeding in the bankruptcy court on her own behalf and on behalf of a putative class of similarly situated individuals. According to Henry, Wells Fargo violated the bankruptcy court's discharge order by attempting to collect a discharged debt. *See* 11 U.S.C. § 524(a)(2) (stating that a discharge "operates as an injunction against . . . an act, to collect, recover or offset" a discharged debt). Henry sought injunctive relief, a declaratory judgment, damages, and attorney's fees.

Wells Fargo moved the bankruptcy court to compel arbitration. Wells Fargo asserted that Henry's claim fell within the scope of the arbitration provision in her loan documentation, and Wells Fargo argued that the Federal Arbitration Act ("FAA") required the bankruptcy court to enforce that provision. Wells Fargo acknowledged that, under our precedents, the bankruptcy court had discretion to refuse to compel arbitration in an action to enforce a discharge order. Wells Fargo maintained, however, that the Supreme

Court's decision in *Epic Systems Corp. v. Lewis*, 138 S. Ct. 1612 (2018) cast doubt on those precedents.

The bankruptcy court denied Wells Fargo's motion. The bankruptcy court reasoned that Henry's claims did not "arise under the loan agreement between the parties," because Wells Fargo's "obligation to comply with the Court's discharge order and the statutory injunction provided under 11 U.S.C. § 524 is not, and cannot be, part of a contractual negotiation between private parties."[2] The bankruptcy court found *Epic Systems* to be "inapplicable to the instant case," because "Henry's claims do not arise out of an arbitrable contract between the parties," and because "the Supreme Court gave no indication in *Epic* that it intended its decision to reach" the Bankruptcy Code. The bankruptcy court certified its order for an interlocutory appeal directly to this court under 28 U.S.C. § 158(a)(3) and (d)(2)(A). Subsequently, we authorized such an appeal pursuant to § 158(d)(2)(A).

## II.

"The Federal Arbitration Act requires courts to enforce covered arbitration agreements according to their terms." *Lamps Plus, Inc. v. Varela*, 139 S. Ct. 1407, 1412 (2019). But the FAA is not the only statute on the books, and its "mandate may be overridden by a contrary congressional command." *Shearson/Am. Express, Inc. v. McMahon*, 482 U.S. 220, 226 (1987). "A party seeking to suggest that two statutes cannot be harmonized, and that one

---

[2] To resolve this appeal, we do not need to address whether the bankruptcy court's interpretation of the arbitration provision was correct, but it is worth noting that other courts have held that disputes about allegedly improper debt collection are at least "related" to the underlying debt. *See Koch v. Compucredit Corp.*, 543 F.3d 460, 466 (8th Cir. 2008) (concluding that "[a] dispute over the collection of a debt incurred under the credit agreement is a 'controversy arising from or related to'" that agreement); *Carbajal v. H&R Block Tax Servs., Inc.*, 372 F.3d 903, 905 (7th Cir. 2004) (Easterbrook, J.) (compelling arbitration of Fair Debt Collection Practices Act claims based on an arbitration agreement found in loan documentation).

displaces the other, bears the heavy burden of showing a clearly expressed congressional intention that such a result should follow." *Epic Sys.*, 138 S. Ct. at 1624 (internal quotation marks omitted). Such an intent can be deduced from statutory text, legislative history, or "from an inherent conflict between arbitration and the statute's underlying purposes." *McMahon*, 482 U.S. at 227.

Applying *McMahon*, we have held that bankruptcy courts may decline to enforce arbitration clauses when two requirements are met. First, the proceeding must adjudicate statutory rights conferred by the Bankruptcy Code and not the debtor's prepetition legal or equitable rights. *In re Nat'l Gypsum Co.*, 118 F.3d 1059, 1069 (5th Cir. 1997). *See also* 10 Collier on Bankruptcy ¶ 9019.05 (16th ed. 2019) ("A trustee in bankruptcy has two kinds of causes of action: those inherited from the debtor and those granted by statute (the so-called avoiding powers)."). Second, bankruptcy courts may decline enforcement of arbitration agreements only if requiring arbitration would conflict with the purposes of the Bankruptcy Code. *In re Gandy*, 299 F.3d 489, 495 (5th Cir. 2002) (citing *Nat'l Gypsum*, 118 F.3d at 1067). Those purposes include "the goal of centralized resolution of purely bankruptcy issues, the need to protect creditors and reorganizing debtors from piecemeal litigation, and the undisputed power of a bankruptcy court to enforce its own orders." *Nat'l Gypsum*, 118 F.3d at 1069.

Accordingly, in *National Gypsum*, we held that bankruptcy courts need not enforce agreements to arbitrate whether a creditor's efforts to collect a debt violated a discharge order. *Id.* at 1071. A debtor's right to be free from collection efforts for discharged debts is a creature of the Bankruptcy Code. 11 U.S.C. § 524(a). An action to enforce such a right implicates an important bankruptcy policy, the ability of a bankruptcy court to enforce its own orders, such that requiring arbitration "would be inconsistent with the Bankruptcy Code." *Nat'l Gypsum*, 118 F.3d at 1071.

On appeal, we review whether a bankruptcy court was obliged to enforce an arbitration clause de novo. *In re Gandy*, 299 F.3d at 494. If the FAA does not require a bankruptcy court to enforce an arbitration clause, then the bankruptcy court has discretion regarding whether to order arbitration, and "the exercise of that discretion is reviewable only for abuse." *Id.*

## III.

Wells Fargo's appeal presents a single issue: Does our holding in *National Gypsum*—that bankruptcy courts have discretion to refuse to compel arbitration in proceedings seeking enforcement of a discharge injunction— remain good law following the Supreme Court's decision in *Epic Systems*? We conclude that it does.

Under the rule of orderliness, "one panel of this circuit may not overturn another panel absent an intervening decision to the contrary by the Supreme Court or this court en banc." *United States v. Simkanin*, 420 F.3d 397, 420 n.25 (5th Cir. 2005). To overrule one of our precedents, a "Supreme Court decision must be more than merely illuminating with respect to the case before us." *Martin v. Medtronic, Inc.*, 254 F.3d 573, 577 (5th Cir. 2001). Instead, "a panel of this court can only overrule a prior panel decision if 'such overruling is unequivocally directed by controlling Supreme Court precedent.'" *Id.* (quoting *United States v. Zuniga-Salinas*, 945 F.2d 1302, 1306 (5th Cir. 1991)).

Far from unequivocally directing us to overrule *National Gypsum*, *Epic Systems* shows that *National Gypsum*'s doctrinal foundation, i.e., *McMahon*, remains sound. For one thing, *Epic Systems* cites *McMahon* for support. 138 S. Ct. at 1627. For another, *McMahon* and *Epic Systems* apply essentially the same tests for determining whether a statute overrides the FAA's command to enforce arbitration agreements according to their terms. In *McMahon*, the Court said that:

> Like any statutory directive, the Arbitration Act's mandate may be overridden by a contrary congressional command. The burden is on the party opposing arbitration, however, to show that Congress intended to preclude a waiver of judicial remedies for the statutory rights at issue. If Congress did intend to limit or prohibit waiver of a judicial forum for a particular claim, such an intent "will be deducible from [the statute's] text or legislative history," or from an inherent conflict between arbitration and the statute's underlying purposes.

*McMahon*, 482 U.S. at 226-27 (alteration in original) (citations omitted) (quoting *Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.*, 473 U.S. 614, 628 (1985)). While the Supreme Court's decision in *Epic Systems* has a different tone, the test it employs is substantially the same as *McMahon*'s:

> Even if the Arbitration Act normally requires us to enforce arbitration agreements like theirs, the employees reply that the [National Labor Relations Act] overrides that guidance in these cases and commands us to hold their agreements unlawful yet.
>
> This argument faces a stout uphill climb. When confronted with two Acts of Congress allegedly touching on the same topic, this Court is not at liberty to pick and choose among congressional enactments and must instead strive to give effect to both. A party seeking to suggest that two statutes cannot be harmonized, and that one displaces the other, bears the heavy burden of showing a clearly expressed congressional intention that such a result should follow. The intention must be clear and manifest.

*Epic Sys.*, 138 S. Ct. at 1623-24 (citations and internal quotation marks omitted). The difference between a "deducible" congressional intent, *McMahon*, 482 U.S. at 227, and a "clear and manifest" intent, *Epic Sys.*, 138 S. Ct. at 1624, is not an unequivocal direction to overrule our precedent.

Wells Fargo argues that *Epic Systems* altered *McMahon*, because the former "expressly rejected the use of legislative history." While *Epic Systems* says that "legislative history is not the law," *Epic Sys.*, 138 S. Ct. at 1631, that statement clarifies that the legislative history upon which the dissent relies does not trump the "[l]inguistic and statutory context" identified by the

majority. *Id.* That is not the same as saying that legislative history can never be relevant when interpreting a statute.

Even if *Epic Systems*'s comments regarding legislative history partially overrule *McMahon*, that change would not affect the validity of *National Gypsum*, because *National Gypsum* did not rely on legislative history. Instead, in determining whether the FAA's requirements were overridden, *National Gypsum* looked to the purposes of the Bankruptcy Code. 118 F.3d at 1069. And statutory purpose remains a valid tool for determining whether a given statute displaces the FAA. *See Epic Sys.*, 138 S. Ct. at 1627 ("Union organization and collective bargaining in the workplace are the bread and butter of the NLRA, while the particulars of dispute resolution procedures in Article III courts or arbitration proceedings are usually left to other statutes and rules . . . ."). Consequently, we conclude that *National Gypsum*'s application of *McMahon* remains good law following *Epic Systems*.

## IV.

For the foregoing reasons, we AFFIRM.